Slip Op 13-44

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| WIND TOWER TRADE COALITION, | |
| Plaintiff, | Before: Leo M. Gordon, Judge |
| v. | Court No. 13-00080 |
| UNITED STATES, | Court No. 13-00081 |
| Defendant. | Court No. 13-00082 |

[Motions for preliminary injunction denied.]

Dated: March 29, 2013

    Alan H. Price, Daniel B. Pickard, Robert E. DeFrancesco, III, Lori E. Scheetz, and Derick Holt, Wiley Rein LLP of Washington, DC for Plaintiff Wind Tower Trade Coalition.

    Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC for Defendant United States. With him on the brief were Stuart F. Delery, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of Counsel was Daniel J. Calhoun, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce of Washington, DC.

    Bruce M. Mitchell, Ned H. Marshak, Mark E. Pardo, Andrew B. Schroth, and Andrew T. Schutz, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY for Defendant-Intervenors CS Wind China Co., Ltd., CS Wind Vietnam Co., Ltd., and CS Wind Corporation.

    Bruce M. Mitchell, Ned H. Marshak, and Kavita Mohan, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY for Defendant-Intervenor Titan Wind Energy (Suzhou) Co., Ltd.

    Mark D. Davis, Davis & Leiman P.C., of Washington, DC for Defendant-Intervenor Chengxi Shipyard Co., Ltd.

    Elliot J. Feldman and Michael S. Snarr, BakerHostetler, of Washington, DC for Defendant-Intervenor Siemens Energy Inc.

**OPINION and ORDER**

Gordon, Judge: These actions involve the administration of trade remedy provisional measures (cash deposits) pursuant to Sections 706(b) and 736(b) of the Tariff Act of 1930, as amended, 19 U.S.C. §§ 1671e(b) & 1673e(b),[1] by the U.S. Department of Commerce ("Commerce") at the conclusion of the antidumping and countervailing duty investigations covering utility scale wind towers from the People's Republic of China ("China") and the antidumping investigation covering that same merchandise from the Socialist Republic of Vietnam ("Vietnam"). Utility Scale Wind Towers from the People's Republic of China, 78 Fed. Reg. 11,146 (Dep't of Commerce Feb. 15, 2013) (antidumping duty order); Utility Scale Wind Towers from the People's Republic of China, 78 Fed. Reg. 11,152 (Dep't of Commerce Feb. 15, 2013) (countervailing duty order); Utility Scale Wind Towers from the Socialist Republic of Vietnam, 78 Fed. Reg. 11,150 (Dep't of Commerce Feb. 15, 2013) (antidumping duty order) (collectively, "Orders"). In those investigations the U.S. International Trade Commission ("ITC") found injury to the domestic industry in an evenly divided vote (3-3). Utility Scale Wind Towers from China and Vietnam, 78 Fed. Reg. 10,210 (Int'l Trade Comm'n Feb. 13, 2013); see also Utility Scale Wind Towers from China and Vietnam, USITC Inv. Nos. 701-TA-486 and 731-TA-1196 (Final), USITC Pub. 4372 (Feb. 2013); see also 19 U.S.C. § 1677(11) (tie-breaking provision). Among the three affirmative

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provision of Title 19 of the U.S. Code, 2006 edition.

votes, two Commissioners found material injury, with the third finding threat, but no material injury in the absence of provisional measures. 78 Fed. Reg. 10,210 at n.2. Commerce, in turn, has said that it will instruct U.S. Customs and Border Protection ("Customs") to release the cash deposits on subject merchandise entered before the date of the ITC's final determination in accordance with 19 U.S.C. §§ 1671e(b)(2) and 1673e(b)(2). See Orders.

Plaintiff seeks preliminary injunctions to (1) enjoin Commerce from terminating the suspension of liquidation and ordering the refund of cash deposits for entries of subject merchandise that were entered or withdrawn from warehouse for consumption prior to February 13, 2013; and (2) enjoin Customs during the pendency of this litigation before this court, including any subsequent remands and subsequent appeals, from discontinuing the suspension of liquidation and refunding cash deposits on the subject merchandise. Pl.'s Amend. Mot for Temporary Restraining Order & Prelim. Inj. at 1, ECF No. 15 (Court No. 13-00080).

The court initially denied Plaintiff's applications for temporary restraining orders ("TRO") and preliminary injunctions because it believed Plaintiff had not made an adequate showing on the likelihood of success on the merits. Order Denying Temp. Restraining Order, Feb. 28, 2013, ECF No. 21 (Court No. 13-00080) ("Feb. 28 Order"). Plaintiff then submitted a supplemental response further explaining its position on its likelihood of success. Pl.'s Resp. to the Court's Mem. and Order, Mar. 1, 2013, ECF No. 22 (Court No. 13-00080) ("Pl.'s Supp. Br."). Although the court still harbored doubts

about Plaintiff's showing on the likelihood of success, the court entered a TRO to allow the other interested parties an opportunity to respond to Plaintiff's motions. Second Mem. and Order on Pl.'s Application for a TRO and Prelim. Inj., Mar. 4, 2013, ECF No. 23 (Court No. 13-00080) ("Mar. 4 Order"). Defendant and Defendant-Intervenors, CS Wind Corporation, CS Wind China Co., Ltd., and CS Wind Vietnam Co., Ltd. (collectively "CS Wind"), have since expressed their opposition. Def.-Intervenors' Opp'n to Pl.'s Mot. for Prelim. Inj., Mar. 8, 2013, ECF No. 25; Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj., Mar. 15, 2013, ECF No. 38. For the reasons set forth below, the court will enter an order denying Plaintiff's motions.

## I. Standard Governing Issuance of Preliminary Injunction

To prevail on a motion for a preliminary injunction, the movant must establish that (1) the movant is likely to succeed on the merits, (2) the movant is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips movant's favor, and (4) an injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); American Signature, Inc. v. United States, 598 F.3d 816, 823 (Fed. Cir. 2010).

In antidumping and countervailing duty cases preliminary injunctions against liquidation have become almost automatic due to the retrospective nature of U.S. trade remedies, see 19 C.F.R. § 351.212.(a), the length of the judicial review process, and the cruciality of unliquidated entries for judicial review, see Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983); SKF USA, Inc. v. United States, 512 F.3d

1326, 1329 (Fed. Cir. 2008) ("The Zenith rule renders a court action moot once liquidation occurs."); see also Qingdao Taifa Group Co. v. United States, 581 F.3d 1375, 1381-82 (Fed. Cir. 2009) ("[T]he court . . . recognizes that 19 U.S.C. § 1516a(c)(2) envisions the use of preliminary injunctions in the antidumping context to preserve proper legal options and to allow for a full and fair review of duty determination before liquidation."). The court has managed the irreparability of liquidation by employing a sliding scale that requires a somewhat lower burden on the likelihood of success. Id. In most antidumping and countervailing duty cases, motions for preliminary injunctions are typically on consent. Cf. Ugine & Alz Belgium v. United States, 452 F.3d 1289, 1297 (Fed. Cir. 2006) (reversing denial of preliminary injunction despite all parties consenting "to entry of a preliminary injunction prior to the trial court's ruling"). The other parties in this action have not consented to Plaintiff's motions.

Notwithstanding the near automaticity of preliminary injunctions in antidumping and countervailing duty cases, they are not awarded as of right. See Qingdao Taifa, 581 F.3d at 1382 (acknowledging Supreme Court's "emphasis on the importance of the likelihood of success in the preliminary injunction calculus" in Munaf v. Geren, 553 U.S. 674, 689-690 (2008)). The movant must still demonstrate at least a fair chance of success on the merits. Id. (quoting U.S. Ass'n of Imps. of Textiles & Apparel v. Dep't of Commerce, 413 F.3d 1344, 1347 (Fed. Cir. 2005)); FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993) ("Absent a showing that a movant is likely to succeed on the

merits, we question whether the movant can ever be entitled to a preliminary injunction unless some extraordinary injury or strong public interest is also shown.").

## II. Discussion

### A. Background

Following a preliminary affirmative determination by Commerce, provisional measures take effect pursuant to 19 U.S.C. §§ 1671b(d)(2), 1673b(d)(2), which suspend liquidation and require cash deposits for entries of merchandise covered by the investigation. These remedies are provisional because at that point in the investigation only half of the trade remedy equation has been satisfied; the other half is the ITC's final injury determination, see 19 U.S.C. §§ 1671(a)(2), 1673(2), which dictates whether the provisional cash deposits ripen into antidumping or countervailing duties, see 19 U.S.C. §§ 1671e(b) and 1673e(b).

An ITC final injury determination comprises the votes of the six individual Commissioners, each of whom chooses from among a menu of statutorily defined choices (no injury, material injury, threat of material injury, or material retardation of establishment of industry). 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1), 1677(7); see also U.S. Steel Group v. United States, 96 F.3d 1352, 1360 (Fed. Cir. 1996) ("The Commission makes its determinations by tallying the votes of the six individual commissioners."). When a Commissioner votes for threat of material injury, that Commissioner must also make an additional finding about whether the domestic industry would have been materially injured in the absence of (or "but for") the

provisional measures. 19 U.S.C. §§ 1671d(b)(4)(B), 1673d(b)(4)(B). This additional finding correlates with sections 1671e(b) and 1673e(b), and depending on the other Commissioners' votes, may affect whether the cash deposits provisionally in place are refunded under the "special rule" or retained under the "general rule" (and applied against any antidumping and countervailing duties imposed). The additional "but for" findings, when relevant, enable Commerce to identify whether the ITC has determined that a domestic industry was materially injured during the provisional measures period coincident with any sales at less than fair value or countervailable subsidies, thus completing the trade remedy equation for entries covered by provisional measures.

Plaintiff challenges Commerce's application of 19 U.S.C. §§ 1671e(b) and 1673e(b), which establish a "general" and "special" rule for handling any provisional measures in place when antidumping or countervailing duty orders issue. The "general rule" applies if the ITC finds material injury or threat with an affirmative "but for" finding, and duties are imposed on any provisionally suspended entries. 19 U.S.C. §§ 1671e(b)(1), 1673e(b)(1). Alternatively, the "special rule" applies if the ITC finds threat of material injury with a negative "but for" finding, or material retardation of the establishment of an industry, and any provisional cash deposits are refunded because Commerce's orders are effective from the publication date of the ITC's final determination. 19 U.S.C. §§ 1671e(b)(2), 1673e(b)(2).[2]

---

[2] Commerce has combined the two operative rules into one regulation, 19 C.F.R. § 351.211(b)(3). Although the regulation is somewhat more accessible and readable

The general and special rules of sections 1671e(b) and 1673e(b) were enacted by the Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144, which implemented the United States' international commitments at the conclusion of the Tokyo Round of Multilateral Trade Negotiations, including the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade addressing antidumping duties, and the Agreement on Interpretation and Application of Articles VI, XVI, and XXIII of the General Agreement on Tariffs and Trade addressing countervailing duties. The purpose of sections 1671e(b) and 1673e(b) was to implement the provisions of those agreements <u>prohibiting</u> the collection of duties during the provisional measures period "<u>unless</u> the final determination is that there is material injury or threat of material injury which, but for provisional measures, <u>e.g.</u>, suspension of liquidation, during the investigation, would have been material injury." S. Rep. No. 96-249, at 59, 77 (1979), <u>reprinted in</u> 1979 U.S.C.C.A.N. 381, 463 (emphasis added). Both of those agreements recognize that, without a finding of material injury or threat with an affirmative "but for" finding, there is no affirmative injury determination to support the imposition of duties during the provisional measures period. See Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade (Apr. 12,

---

than sections 1671e(b) and 1673e(b), it essentially just paraphrases them, meaning that the issue here does not implicate Commerce's interpretation of its regulation, but its application and interpretation of the statutory provisions themselves. <u>See</u> <u>Gonzales v. Oregon</u>, 546 U.S. 243, 257 (2006) ("the existence of a parroting regulation does not change the fact that the question . . . is not the meaning of the regulation but the meaning of the statute.").

1979), GATT B.I.S.D. (26th Supp.) at 171, 181 (1980) ("Provisional measures may be taken only after a preliminary affirmative finding has been made that there is dumping and that there is sufficient evidence of injury, as provided for in (a) to (c) of paragraph 1 of Article 5."); Agreement on Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement on Tariffs and Trade (Apr. 12, 1979), GATT B.I.S.D. (26th Supp.) at 56, 63 (1980) ("Provisional measures may be taken only after a preliminary affirmative finding has been made that a subsidy exists and that there is sufficient evidence of injury as provided for in Article 2, paragraph 1 (a) to (c).").[3]

The statute does not explicitly address whether the general or special rule applies to the fragmented ITC voting pattern presented in these cases: an evenly divided affirmative determination comprising three negative votes and three affirmative votes, with two commissioners voting for material injury and one voting for threat with a

---

[3] The same restrictions on the imposition of duties during the provisional measures period carried forward into the current Agreement on Implementation of Article VI concerning antidumping duties and the Agreement on Subsidies and Countervailing Measures, both adopted at the conclusion of the Uruguay Round of Multilateral Trade Negotiations in 1994. "Article 10 provides several exceptions to this general principle that . . .{"antidumping duties, in the case of a final determination, will apply to imports entered after" the final determination is made} . . . that permit the national authorities to apply final duties to imports entered at an earlier stage of an investigation. First, as under current U.S. law, national authorities may apply definitive antidumping duties from the date of application of provisional measures if the final injury determination is based on present material injury. Second, as under current law, national authorities may apply definitive antidumping duties from the date of application of provisional measures if the final injury determination is based on threat of material injury if the authorities determine that but for the application of provisional measures injury would have occurred." Uruguay Round Amendments Act, Statement of Administrative Action, H.R. Doc. No. 103-316, at 816 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4158.

"but for" negative material injury finding. It is, however, a voting pattern that the court has addressed once before in MBL (USA) Corp. v. United States, 16 CIT 108, 787 F. Supp. 202 (1992) ("MBL").

In MBL the court reviewed Commerce's interpretation of 19 U.S.C. § 1673e following an ITC injury determination with the same fragmented voting pattern here. There were three negative votes and three affirmative votes, including two for material injury, and one for threat of material injury with a "but for" negative finding pursuant to 19 U.S.C. § 1673d(b)(4)(B). Commerce did not apply the special rule of section 1673e(b)(2) despite the 4 negative votes of material injury for the provisional measures period, and instead planned to apply the general rule of 19 U.S.C. § 1673e(b)(1) and impose duties on the suspended entries. The court reviewed Commerce's interpretation of 19 U.S.C. § 1673e(b) under the second prong of Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–45 (1984), and determined that Commerce's interpretation was an unreasonable application of the statute to which the court could not defer.

The court noted Commerce's position of ignoring the three negative votes and focusing on the three affirmative votes: "Commerce first determines whether the Commission as a whole has made an affirmative or a negative determination. If Commerce determines that the Commission has made an affirmative determination, it then analyzes the affirmative votes of the Commissioners to determine the appropriate date for the imposition of antidumping duties." MBL, 16 CIT at 113-14, 787 F. Supp. at

207–08 (quoting government brief at 15-16).  The court questioned the reasonableness of this approach:

> If this was the approach, whether based on agency practice or not, the court is not persuaded that it led to the proper adherence to 19 U.S.C. § 1673e(b).  To be sure, subsection (2) thereof does not refer to a "negative" determination; it refers to a "final determination" of the Commission.  And, while the final determinations in these cases were affirmative under section 1677(11), if two of the three commissioners reporting negative views had considered the facts as constituting instead threats of material injury and then made negative but-for findings, as Commissioner Rohr did, the special rule of subsection (2) would have been applied.  Yet, although those three actually reached outright negative conclusions, the dictate of section 1673e(b)(1) was apparently followed by the ITA—in the face of the fact that a majority of the ITC members had found that the domestic industry was not being materially injured, and would not have been during the time in question in the absence of provisional relief.  Inherent in such negative views is the realization that antidumping duties will not be imposed, just as affirmative views can signify imposition of such duties from the date of a preliminary less-than-fair-value determination rather than from the date of a final decision on material injury.

Id.  The MBL court did some simple math and could not understand how two votes for and four votes against material injury during the provisional measures period could reasonably justify application of the general rule.

In this case respondents alerted Commerce to MBL and argued that Commerce should therefore apply the special rule. Plaintiff responded, arguing that there were conflicting precedents at the U.S. Court of International Trade and that Commerce had a practice of applying the general rule to the voting pattern in question.  Commerce ultimately applied the special rule, expressly noting the holding of MBL in each of the Orders.  Utility Scale Wind Towers from the People's Republic of China, 78 Fed. Reg.

11,146, 1147 n.8 (Dep't of Commerce Feb. 15, 2013) (antidumping duty order) (other footnotes omitted); see also Utility Scale Wind Towers from the People's Republic of China, 78 Fed. Reg. 11,152, 11,153 n.8 (Dep't of Commerce Feb. 15, 2013) (countervailing duty order); Utility Scale Wind Towers from the Socialist Republic of Vietnam, 78 Fed. Reg. 11,150, 11,151-52 n.11 (Dep't of Commerce Feb. 15, 2013) (antidumping duty order).

### B. Likelihood of Success on the Merits

Plaintiff contends that Commerce erred in applying the special rule and must instead follow the general rule of sections 1671e(b)(1) and 1673e(b)(1).  Given MBL, the court was initially skeptical of any likelihood of success on this issue.  See Feb. 28 Order; Mar. 4 Order.  Having since reviewed the responses of Defendant and CS Wind, the court is now even further persuaded that this issue is just not winnable.  Beginning from the premise that Congress did not address the specific ITC voting pattern presented here, it is not difficult to sustain Commerce's interpretation of sections 1671e(b) and 1673e(b) as a reasonable construction of the statute to which the court must defer.

When the court examines the lawfulness of Commerce's statutory interpretations, it employs the two-pronged test established in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–45 (1984).  The court first examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency and the court must honor the clear intent of Congress.  Id. at 842-43.  If, however, "the

statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843. "Any reasonable construction of the statute is a permissible construction," Timken Co. v. United States, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (citation omitted). To determine whether Commerce's interpretation is reasonable, the court "may look to 'the express terms of the provisions at issue, the objectives of those provisions, and the objectives of the antidumping scheme as a whole.'" Wheatland Tube Co. v. United States, 495 F.3d 1355, 1361 (Fed. Cir. 2007) (quoting NSK Ltd. v. United States, 26 CIT 650, 654, 217 F. Supp. 2d 1291, 1297 (2002)).

Commerce's application of the special rule to the fragmented ITC voting pattern here (3 negative, 2 material injury, 1 threat plus "but for" negative) flows reasonably from the specific statutory provisions, their purposes, and the statute as a whole, as the court explained in MBL. The statute states that imposing an earlier effective date for the orders under the general rule is proper when the ITC "finds material injury or threat of material injury [with an affirmative "but for" determination.]" 19 U.S.C. §§ 1671e(b)(1), 1673e(b)(1). And here, although the Commission reached an affirmative injury determination, it was fragmented with a majority of four Commissioners finding that the domestic industry was not materially injured during the provisional measures period.

This was the same circumstance analyzed and explained 20 years ago by the court in MBL.  Commerce's decision to apply the special rule consistent with the analysis of MBL is reasonable.

Plaintiff insists that the special rule cannot apply because only one Commissioner voted for threat. Pl.'s Supp. Br. at 10.  Plaintiff misunderstands the consequences of a fragmented ITC affirmative determination.  The fragmented determination here necessarily involved a finding that the domestic industry was at least threatened with material injury because in addition to the one threat finding, the two broader material injury findings inherently entail the narrower finding of threat. Cf. MBL, 16 CIT at 113-14, 787 F. Supp. at 208 (explaining that three negative determinations inherently entailed negative "but for" determinations as well).  And in trying to resolve the proper treatment of the provisional measures under the general or special rule, it was reasonable for Commerce to interpret the ITC's fragmented affirmative determination based upon the narrower ground of the one vote for threat plus the negative "but for" determination rather than the two Commissioners' material injury votes that were outnumbered by the four Commissioners voting against material injury during the provisional measures period.

Plaintiff also contends that there are conflicting precedents at the Court of International Trade. Pl.'s Supp. Br. at 8-9.  The court does not agree.  There is one applicable precedent covering the ITC voting pattern presented in this case: MBL.  The earlier case upon which Plaintiff relies, Metallverken Nederland B.V. v. United States,

Court No. 13-00080                                                                                                            Page 15
Court No. 13-00081
Court No. 13-00082

13 CIT 1013, 728 F. Supp. 730 (1989), did not involve the same ITC voting pattern, nor did it involve Commerce's interpretation of an ITC final determination, as Commerce was not a party to the action.  The court in MBL examined the Metallverken decision and found it of limited persuasive weight on the question of the proper treatment of provisional measures.  MBL, 16 CIT at 111-12, 787 F. Supp. at 206.

      Finally, Plaintiff contends that Commerce's application of the special rule represents an unexplained departure from agency practice.  Pl.'s Supp. Br. at 8, 12.  Plaintiff attempts to identify an agency "practice" from Silicomanganese from Brazil, 59 Fed. Reg. 66,003 (Dep't of Commerce Dec. 22, 1994) (antidumping duty order), a single instance post-dating MBL in which Commerce appears to have treated the same ITC voting pattern as requiring imposition of duties from the date of suspension of liquidation following a preliminary affirmative determination by Commerce.  Of note, the lone respondent in the investigation withdrew its participation.  See Silicomanganese from Brazil, 59 Fed. Reg. 55,432, 55,433 (Dep't of Commerce Nov. 7, 1994) (final antidumping determination).  Despite Commerce not explaining its reasoning, or mentioning MBL, see Silicomanganese from Brazil, 59 Fed. Reg. at 66,003-04, Plaintiff overstates this single, nearly 20-year-old post-MBL proceeding as Commerce "disagree[ing] with the [C]ourt's finding in MBL" and establishing or continuing an operative agency "practice" regarding provisional measures.  Pl.'s Supp. Br. at 12.

      More fundamentally though, Commerce's interpretation of the statute in Silicomanganese from Brazil does not preclude Commerce's interpretation here.  To the

extent <u>Silicomanganese from Brazil</u>, a single case from 19 years ago, can be said to establish any sort of post-<u>MBL</u> agency practice, Commerce provided an explanation in the <u>Orders</u> citing directly to <u>MBL</u> as to why interpreting the statute in a different manner is reasonable.  Under the <u>Chevron</u> framework initial agency interpretations are not "instantly carved in stone" and may change so long as an agency provides a reasonable basis for doing so.  <u>Rust v. Sullivan</u>, 500 U.S. 173, 186-87 (1991); <u>see also</u> <u>National Cable & Telecomms. Ass'n v. Brand X Internet Servs.</u>, 545 U.S. 967, 981 (2005) ("Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the <u>Chevron</u> framework. . . . For if the agency adequately explains the reasons for a reversal of policy, 'change is not invalidating, since the whole point of <u>Chevron</u> is to leave the discretion provided by the ambiguities of a statute with the implementing agency.'" (internal citations omitted)).  In issuing the <u>Orders</u> Commerce provided an interpretation of the statute that has already been validated by the court in <u>MBL</u>.

Given the reasonableness of Commerce's application of the special rule, the court cannot direct Commerce by affirmative injunction to apply the general rule, leaving Plaintiff without a fair chance of success in this action.

### C. Irreparable Injury

As noted above, parties tend to establish irreparable injury fairly easily in trade cases because of the negative consequences of liquidation.  Here, the court believes that Plaintiff has established such injury because once the entries covered by the provisional measures are liquidated, the court cannot provide any meaningful relief for

Plaintiff.  Both Defendant and CS Wind suggest that Plaintiff may not satisfy the Zenith standard of irreparable harm because the underlying proceeding was an investigation, not an administrative review.  See American Spring Wire Corp. v. United States, 7 CIT 2, 5, 578 F. Supp. 1405, 1408 (1984) (if court is reviewing "a final agency determination under 19 U.S.C. §§ 1303, 1671d or 1673d, the party seeking injunctive relief must make some showing of immediate and irreparable injury beyond the mere invocation of Zenith.").  The court, though, does not see much merit in this contention and believes Plaintiff has easily satisfied the Zenith standard.

### D. Balance of Equities

Although Plaintiff appears to have established irreparable injury in the absence of an injunction, and this usually is enough to tip the equities in the movant's favor in a trade case, here, in addition to the problem of Plaintiff failing to establish a likelihood of success on the merits, the unique aspects of provisional measures adds additional considerations to the balance of the equities.  Provisional measures are accorded distinct treatment in the antidumping and countervailing duty laws.  They take effect when Commerce issues a preliminary affirmative less than fair value or countervailing duty determination, and generally "may not remain in effect for more than 4 months." 19 U.S.C. §§ 1671b(d), 1673b(d).  An injunction against liquidation for the pendency of the litigation would necessarily prolong the provisional measures well beyond their statutory limits.  Another characteristic of provisional measures is that there is no interest on refunds of provisional cash deposits under the special rule.  See 19 U.S.C.

§§ 1671e(b)(2), 1673e(b)(2), 1677(g); see also Dynacraft Indus., Inc. v. United States, 24 CIT 987, 118 F. Supp. 2d 1286 (2000).  Therefore, the longer the entries covered by the provisional remedies remain unliquidated, the longer importers who have paid provisional cash deposits are denied access to their refunds without any possibility of obtaining interest.

Given the weakness of Plaintiff's arguments on the merits, the court is concerned that issuance of preliminary injunctions against liquidation here may be a misuse of the court's equitable power by keeping the provisional measures in place beyond their prescribed 4-month period and by depriving importers of the time value of their provisional cash deposits.  The court therefore does not believe that the balance of the equities favors the movant.

### E. Public Interest

A preliminary injunction is generally in the public interest in order "to maintain the status quo of the unliquidated entries until a final resolution of the merits." Smith–Corona Group v. United States, 1 CIT 89, 98, 507 F. Supp. 1015 (1980).  Nevertheless, the court does not believe it is in the public interest to issue preliminary injunctions in actions where there is no likelihood of success on the merits.

### III. Conclusion

For the foregoing reasons, the court does not believe that issuance of preliminary injunctions in these actions is appropriate.  Accordingly, it is hereby

Court No. 13-00080 Page 19
Court No. 13-00081
Court No. 13-00082

**ORDERED** that Plaintiff's motions for preliminary injunctions are denied; and it is further

**ORDERED** that the Temporary Restraining Orders issued March 4, 2013 are dissolved.

                                                         /s/ Leo M. Gordon
                                                      Judge Leo M. Gordon

Dated:    March 29, 2013
              New York, New York